B. J. Boyd, Commissioner;

*v.*

General Motors Acceptance Corporation and Charles Lester.

(*Nashville,* December Term, 1958.)

Opinion filed October 2, 1959.

HENRY C. FOUTCH, Assistant Attorney General, for plaintiff-in-error.

JACOBS H. DOYLE, Nashville, O. W. McKENZIE, Dayton, for defendant-in-error.

MR. JUSTICE BURNETT delivered the opinion of the Court.

This is an appeal by the Commissioner of Finance and Taxation of the State of Tennessee from an adverse decision rendered against him, wherein the lower court reversed an order of seizure and confiscation heretofore issued by the Commissioner.

The case involves the seizure and confiscation of a certain 1955 model Buick automobile, bearing motor number 491189588, which was seized by the Tennessee Highway Patrol in Rhea County, Tennessee, on the night of December 6, 1957, when said vehicle was found parked off the side of a country road and stored therein was eight gallons of moonshine whisky, said whisky being in direct violation of Section 57-622, T.C.A.

There were two separate petitions filed before the Commissioner seeking recovery of said motor vehicle as authorized by Section 57-623, T.C.A.

The defendant in error, General Motors Acceptance Corporation, holds a conditional sales contract on the automobile which it purchased from a dealer in Dayton, Rhea County, Tennessee. The defendant in error, Lester, is the registered owner of the automobile and he had purchased the same on August 3, 1957. The lienor purchased the conditional sales contract two days later at its office in Chattanooga, the balance on said contract being $1,288.50. The contract was to run for a period of twenty-four months with monthly payments of $69.33 each. Four payments had been made on the contract at the time of the seizure. Prior to the time of the contract the contract was purchased by the lienor, G.M.A.C., they did not know Charles Lester and had had no previous dealings with him and made no investigation as to his reputation for dealing in contraband liquor.

At the time Lester purchased the automobile he furnished the dealer with a financial statement in which he showed that he was a self-employed farmer whose income was listed at $400 per month. No investigation of any kind concerning Lester was made by the lienor until after the vehicle had been seized by the Highway Patrol as above indicated. After the seizure by the Highway Patrol the lienor asked or inquired of two enforcement officers of Rhea County as to his reputation. Lester had been a resident all of his life of Bledsoe County, Tennessee.

The record as made up before the hearing officer of the Department of Finance and Taxation who heard the case on behalf of the Commissioner shows on the night of December 5, 1957, Lester after finishing his supper decided to go coon-hunting. He got his coon dog in his automobile and drove about a half a mile to the home of his brother-in-law, one Swafford, and they and their dogs then went some 3 miles away and according to their sworn testimony parked the automobile and went into the mountains with these dogs coon-hunting. These parties had no guns or other things, the only thing that they had on this coon hunt was a flashlight and three dogs. After some hour or two of hunting with no success they returned, according to their statements, to where they had parked the car and found that the car was gone. The parties then went by the home of Swafford, got his car and then from there on to the home of Lester and not being able to find out anything about the car they called a deputy sheriff at Pikeville, Bledsoe County, Tennessee and told him that the car had been stolen. Then they drove to Dayton and went to the home of the dealer of cars who had sold this Buick automobile to

Lester and told him that the car had been stolen and was missing and then they called the deputy sheriff in Dayton. In the course of these various conversations by telephone and by word of mouth they found, according to Lester and Swafford, that the car had been seized by the Highway Patrol and this seizure is what brought about the present litigation.

The defense is primarily based on the fact that the testimony of Lester and Swafford is to the effect that the car had been stolen and they had no knowledge of it containing moonshine liquor and that neither of them dealt in moonshine liquor. The testimony of the agent of the lienor is that they accepted the word of the car dealer that Lester was all right when they purchased the car and consequently they depended on him (the car dealer) and made no investigation as is required by the statute, Sec. 57-622 et seq., T.C.A.

In this hearing before the hearing officer, Lester and Swafford testified as to the above related facts. In answer to their testimony the State offered the testimony of a State Highway Patrolman who had along the chief deputy sheriff of Rhea County when he seized the car. It was the testimony of these two officers, that is, the State Highway Patrolman and the chief deputy sheriff that they had information that there was an abandoned car up on Evansville Mountain and that they were on their way there to investigate the matter when they saw a car coming down the mountain some 100 yards or so ahead of them.

They stopped the Highway Patrol car, and turned on the red dome light which revolved, and got out in the road and attempted to stop this car as it approached

them. When the car got something less than 100 yards away and facing this patrol car with the red dome light revolving this Buick automobile sped up and passed the trooper and the deputy sheriff at a high rate of speed, and made these parties jump out of the road. As the car passed this trooper and deputy sheriff they fired four shots at it, two of these shots stiking the car in the back. As quick as this was done the trooper and the deputy sheriff jumped in their car and turned it around and proceeded at a rapid rate of speed to follow this car. It was testified by one of these officers that they could see the tail light of the car in front of them all the way. In about 2 miles they caught up with the car which had been parked off to the side of the road and the door on the driver's side was left open and the lights were still on in the car. As they approached this car they heard some one running through the woods. This car was parked in a very heavily wooded area. These two officers testified as this car passed them up the road when they were trying to stop it they saw the images of two men in the car but they could not identify who these men were.

As quick as they got there and found this abandoned car on the side of the road the officers seeing that they were unable to apprehend the occupants of the car proceeded to search the car and found 8 gallons of moonshine whisky stored in it. The time was fixed at about 8:40 or 8:50 when these officers got to this car which was parked as above indicated. It is interesting to note how this whisky was found in this car. One of the officers says:

"A. Well, we tried to see if the key would open the trunk, the keys would not open the trunk, the back

seat was missing, that is, the seat part, we pulled up the back of the seat, raised it up, and between the two seats in the middle, they had a piece of pasteboard over it, we pulled that out, then we could see the whiskey, eight gallons of white whiskey.''

Lester in his direct testimony says that he went off and evidently left the key in the car when he parked it up in the mountains. There is no showing of where the key got to or what happened to it and this is just said to be the way that the thieves could have easily driven it off.

Lester testifies that he was convicted of dealing in moonshine whisky some 25 or 30 years before this happened. He testifies that he has never been in any liquor trouble since. He does say that he had two children, one 17 years old and one 12 years old and that the 17-year-old boy recently had been convicted of fooling with moonshine whisky. Lester's brother-in-law Swafford, who was with him on this coon hunt on this night had very recently, within the past 2 years, been convicted and served a sentence of a year for fooling with moonshine whisky and at the time of this occurrence his parole period had ended and apparently he could not have been picked up for violation of parole if he had been guilty.

Lester's statement as to financial worth, as above indicated, was that he was a farmer with $400 per month income. His examination, particularly his cross-examination in this record, shows that he had this mountain farm of some 260 acres, but that he only had six acres of corn, ¼th acre of potatoes, 10 acres of Lespedeza hay, a half acre of beans, and this Buick automobile, four cows, three of which were dry, and he had a few chickens

and he did own a 1/3rd interest in some kind of a sawmill with his brother-in-law Swafford but they had not worked at it for some months before. Swafford testifies that when Lester worked there he worked as an ordinary laborer and made $8 per day. He fails to show throughout his testimony where he could have earned a sufficient amount of money to pay these monthly payments. Certainly the farm was no more than a bare subsistence farm for a very inexpensive living.

The chief deputy sheriff of Rhea County testifies herein and says that Lester's reputation in Rhea County and Dayton, and that general community, is that he has the reputation of dealing in illegal whisky. The deputy sheriff of Bledsoe County who Lester called that night to tell him that his car had been stolen, says that everybody that he knows in the County, that it is his reputation, as far as could remember, that Lester dealt in whisky. This deputy sheriff says he does not know of any convictions of things of that kind that Lester has had but that is his reputation.

Thus we have a state of facts in which the owner of the car and the one who was with him deny that they knew they had any whisky in it and use as an excuse that the car was stolen by another and yet at the same time through their own testimony they fail to show in any way where Lester would have a sufficient income to pay the monthly payments on this car. Those around him, including his 17-year-old boy and this brother-in-law whom he was with, had recently been convicted of illicit liquor traffic. The reputation that is given him by these two officers is that of dealing in illegal liquor.

The lienor offers the affidavits of the Sheriff of Rhea County and another affidavit where they said that these two parties who made the affidavits said they did not know of this reputation. Of course the statements of these different deputy sheriffs as to his reputation as well as those of Lester and Swafford as to what they were doing on that night along with the physical facts and things absolutely found merely present a question of proof and the question is as to the credibility of these different witnesses. The trier of facts who heard these witnesses was more than justified in concluding from this evidence, which has been briefly related above, that these parties, Lester, was in the illicit liquor business; that he made his money that way to pay for this car and for other things and even though he had not been convicted under this proof there was more than ample material evidence to sustain the finding of the Commissioner that he was in this business at the time the car was purchased on August 3, 1957, and two days later when the lienor purchased this contract.

As said above the lienor made no investigation prior to the purchase of the contract. If he had made the right kind of an investigation then it is clearly conceivable that he could have determined this fact and consequently not have been subject to the confiscation statutes under which this car was confiscated. It is another outstanding fact in the proof offered in this record that the lienors' representatives apparently concluded that they were willing to take the car dealer's statements as to whether or not the man was in this kind of illicit business and not make any investigation on their part other than take the statement of the car dealer. This kind of

an investigation clearly does not comply with these statutes.

When an appeal is taken from the finding of the Commissioner in these confiscation cases by use of the vehicle to haul or to use contraband goods the person appealing, in this instance both the lienor and the owner of the car, had the right to file their petitions and question the action of the Commissioner by filing a petition for certiorari. When certiorari is granted and review is granted it shall be by way of the common law writ of certiorari (Sec. 57-624, T.C.A.). Thus it is that we have in the instant case these two petitions which were filed by way of the common law writ of certiorari. Such a writ does not bring up for determination any question except the question of whether the Commissioner exceeded his jurisdiction, or acted illegally, arbitrarily or fraudulently. Under such a writ questions of law only are reviewed by the Court. The statute (Sec. 57-624, T.C.A.) under which these writs were granted and the authorities construing the rights under the common law writ (*Hoover Motor Express Co., Inc. v. Railroad & Public Utilities Comm.*, 195 Tenn. 593, 261 S.W.2d 233), do not permit the introduction of additional evidence by the court granting the writ and the review is on the record as made up before the hearing officer. The court is limited to whether or not this hearing officer has exceeded his jurisdiction or acted fraudulently, illegally, or arbitrarily. If there is any material evidence to sustain the finding of the hearing officer under such circumstances and there is no illegal, fraudulent or arbitrary action therein, the court must sustain the finding of the hearing officer. *Putnam County Beer Board v. Speck*, 184 Tenn. 616, 201 S.W.2d 991.

■■ When facts are shown, as herein, of this Highway Patrol car being stopped showing really what kind of a car it was and directing the car to stop and this car did not stop but sped by and nearly hit these officers and after being shot into was abandoned, clearly under such circumstances the officers would have failed in their duty if they had not inspected this car and searched it at the time they found it parked with the lights on there at the side of the road. Consequently anything that they found in the car would be evidence against the car. Where a car is thus found on the side of the road with contraband whisky in it the statutes involved, sec. 57-622 et seq., T.C.A., authorize the confiscation of this car.

■ Clearly to our minds, after a very careful reading of the entire testimony herein, there is no escape from the conclusion reached by the Commissioner, and he clearly had material and competent evidence in weighing the testimony of these parties along with the material facts which bear heavily down on the scales on the side of the fact that this was not a stolen car but was being used and operated by these parties in the transportation or use in contraband or illicit liquor. Just to take one illustration alone it clearly, to our minds, would show that this whisky was not put in this car by the thief of the car, that is, when it is shown that the seat on being taken out, pasteboard was put in and the whisky put in behind the pasteboard. Under the facts here the car was found in an hour or probably a little more after it was said by these parties to have been left on the mountain, and when it was found an hour or so later it had this whisky in it fixed up in that way. Clearly a thief would not have time or would not have gone to the trouble to fix up a car and hide the liquor in it in this way. This is

just merely one of the factual situations to illustrate how the hearing officer was more than justified in concluding that this was not just a stolen car; that somebody else had put liquor in it but was in there by people who had a reputation of dealing in liquor. The hearing officer, too, would have been lax in his duty if he had not found under this proof that the purchaser of this car had the reputation of dealing in illicit liquor. If the lienor had made the proper investigation this could have been determined before they purchased this contract.

The result is that the judgment of the circuit court will be reversed and the action of the Commissioner will be affirmed. The cause is remanded to the Circuit Court in order that the same may be remanded to the Commissioner for further proceedings under the statute.